[Cite as *Brown v. Branscomb*, 2026-Ohio-997.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ROSS COUNTY

| | | |
|---|---|---|
| Wendy D. Brown, Trustee, et al., | : | Case No. 24CA17 |
| Plaintiffs-Appellees, | : | |
| v. | : | <u>DECISION AND</u> <u>JUDGMENT ENTRY</u> |
| William R. Branscomb, | : | |
| Defendant-Appellant, | : | **RELEASED 3/20/2026** |
| v. | : | |
| Wendy D. Brown, et al., | : | |
| Third-Party Defendants- Appellees. | : | |

_____
<u>APPEARANCES</u>:

Mark D. Tolles, II, Benson & Sesser, LLC, Chillicothe, Ohio, for appellant.

Thomas M. Spetnagel, Spetnagel Law Office, Chillicothe, Ohio, for appellees.
_____
Hess, J.

{¶1}　William R. Branscomb appeals from a judgment of the Ross County Court of Common Pleas awarding Wendy D. Brown, as trustee of both the Wendy D. Brown Revocable Living Trust dated March 21, 2000 and the John A. Brown Revocable Living Trust dated March 21, 2000, compensatory damages for conversion, along with punitive damages and attorney fees, and rejecting claims in his counterclaim and third-party complaint. Mr. Branscomb presents two assignments of error asserting the trial court erred when it dismissed his breach of contract and unjust enrichment claims and when it granted judgment "in favor of Brown on Brown's conversion and R.C. 901.50 claims" and

awarded compensatory damages, punitive damages, and attorney fees.  For the reasons which follow, we sustain in part and overrule in part the assignments of error.  We affirm in part and reverse in part the trial court's judgment and remand for further proceedings consistent with this decision.

## I.  FACTS AND PROCEDURAL HISTORY

### A.  Pleadings

{¶2}    In June 2020, Wendy D. Brown, as trustee of three trusts—the Wendy D. Brown Revocable Living Trust dated March 21, 2000 ("Mrs. Brown's trust"), the John A. Brown Revocable Living Trust dated March 21, 2000 ("Mr. Brown's trust"), and the Defined Benefit Pension Plan and Trust of MJT Securities, Inc. (the "Defined Benefit trust")—and Brown's Paint Valley Farms, LLC, filed a complaint against Mr. Branscomb asserting conversion and R.C. 901.51 claims regarding the removal of trees from certain real property.  Mr. Branscomb filed a counterclaim against the plaintiffs and a third-party complaint against Mrs. Brown in her individual capacity and Ray Bradford Salyers d/b/a Brad Salyers.[1]  He asserted claims for (1) promissory estoppel; (2) quiet title; (3) recovery of land by owner; (4) recovery of land by co-tenant; (5) breach of trust; (6) modification or reformation of trust; (7) breach of contract – crop farming; (8) breach of fiduciary duty; (9) tortious interference with business relationship; (10) breach of contract – bushhog contract; (11) unjust enrichment – bushhog services and other services; (12) breach of contract – cattle contract; (13) unjust enrichment – cattle services; (14) recovery of amounts paid for improvements; (15) unjust enrichment – improvements; (16) replevin;

---

[1] Mr. Branscomb also named "John Doe 1-10" as third-party defendants. But he did not amend the third-party complaint under Civ.R. 15(D) to properly name these defendants and did not obtain service on them within the time prescribed by Civ.R. 3(A).  Therefore, he never commenced an action against them.  *See Eastley v. Volkman*, 2009-Ohio-522, ¶ 15 (4th Dist.).

(17) trespass to chattels; (18) conversion; (19) recovery under R.C. 2307.60 and 2307.61; (20) civil conspiracy; (21) slander/libel/defamation; (22) battery; (23) malicious prosecution; and (24) accounting. The matter proceeded to a bench trial.

### B. Bench Trial

### 1. Parcel Ownership

{¶3} The parties stipulated that on October 5, 1989, an approximately 473 acre parcel of real estate was conveyed to Mrs. Brown and her husband, John A. Brown, as co-trustees of the Defined Benefit trust dated January 1, 1984. Due to transfers in December 2018, the property was "currently divided" into parcels of approximately 443 and 30 acres.  On October 5, 1989, an approximately 231.19 acre parcel was conveyed to the Browns in their individual capacities. On March 21, 2000, the Browns conveyed that parcel to Mrs. Brown, as trustee of Mr. Brown's trust, and to Mr. Brown, as trustee of Mrs. Brown's trust. On October 11, 1991, an approximately 451.5 acre parcel was conveyed to the Browns in their individual capacities.  On March 21, 2000, they conveyed that parcel to Mrs. Brown, as trustee of Mr. Brown's trust, and Mr. Brown, as trustee of Mrs. Brown's trust.  The parties disagreed as to who "was/is the current, rightful owner of these parcels of real estate since John A. Brown's death on October 5, 2016."

{¶4} Mrs. Brown testified that she currently owns the 231.19 and 451.5 acre parcels as trustee of Mrs. Brown's trust and Mr. Brown's trust. Evidence presented at trial indicates the 30 acre parcel is owned by Mrs. Brown individually.  Evidence also indicates that the 443 acre parcel was actually further subdivided into 407.128 and 35.872 acre parcels, that the owner of the 407.128 parcel is Brown's Paint Valley Farms, LLC, an entity created in August 2018 of which Mrs. Brown is the sole member, and that the owner

of the 35.872 acre parcel is Mrs. Brown as a trustee. The Browns referred to all the parcels as "Paint Valley Farms."

## 2. Testimony of Mrs. Brown

{¶5} Mrs. Brown, age 82, testified that in 1994, she and her husband entered into a written crop farming lease with Mr. Branscomb and his first wife. Mrs. Brown had not seen a copy of it for about ten years. She testified that it was "a general 50/50 lease." The Browns provided the land and paid taxes and insurance, Mr. Branscomb provided the labor and equipment, and they split the other expenses (including harvesting costs) and crop proceeds 50/50. When asked if the lease renewed on an annual basis, Mrs. Brown testified, "Yes, at least that's what it became." Later, when asked if it automatically renewed for year increments, she testified, "I know it renewed, but I thought maybe they were supposed to say something to one another, but I don't - - but I really can't specify." When asked if it was treated as automatically renewed, she testified, "More or less, yes." When asked if it was her understanding that the lease ran from January 1st to December 31st, she testified, "No I did not understand that." She thought that the lease "kept going until one of the parties wanted out." When asked how much notice would be required, she testified, "I do not remember."

{¶6} In 1998, Mr. Brown became more involved with the Browns' golf course, and Mrs. Brown broke her leg, so Mr. Brown asked Mr. Branscomb to care for the Browns' cattle, do the mowing, fix fences, and perform general farm maintenance. The Browns initially paid him $1,500 per month for these services, which later increased to $1,800 per month. At some point, a separate agreement was made in which the Browns agreed to give Mr. Branscomb 5% of calf sale proceeds "as an incentive to get more cows." When

asked if there were times Mr. Branscomb had to supplement the food the Browns had for the cattle, Mrs. Brown testified, "I have no idea. He never let us know." When asked about a new cattle corral built in 2012, Mrs. Brown testified that Mr. Branscomb approached the Browns about building it, and Mr. Brown said he did not have the money to do this. Mr. Branscomb said he had the materials and would build the corral but take the materials "when I leave." He did not have permission to hire additional laborers to build the corral, and Mrs. Brown did not remember ever reimbursing him for additional laborers to help with cattle care. Mrs. Brown did not know if Mr. Branscomb did anything to fix the creek on the farm. When asked if she was aware of Mr. Branscomb being compensated for other things he did on the property, she testified, "As far as I know, unless it was materials, he was never - - it was never agreed that he would be paid extra for his labor." She assumed the work he did was part of his monthly fee.

{¶7}   In May 2015, Mr. Brown had brain surgery, and in March 2016, he had a second brain surgery, during which it was discovered that he had cancer. In June 2016, the Browns went to California because Mr. Brown knew he was not doing well and wanted to see his mother. They left the morning of June 20, 2016, and returned June 25, 2016. Mr. Branscomb knew of their plans because he cared for the Browns' dogs whenever they went away. In July 2016, Mr. Brown "was falling a lot and hitting his head." After a fall on July 13 or 14, 2016, he was bedridden for a couple weeks during which time Mrs. Brown cared for him. In August 2016, he had additional falls. On August 9, 2016, Mrs. Brown took him to the hospital. He was admitted and never came home again. On October 2, 2016, he was moved to palliative care, and Mrs. Brown stayed with him until his death on October 5, 2016 from glioblastoma, i.e., a brain tumor.

{¶8}  Mr. Branscomb had permission to remove fallen trees, diseased trees, and trees which interfered with farm operations, but he was supposed to talk to Mr. Brown first unless the trees were "over the fence, things that were damaging the fence."  The Browns and Mr. Branscomb agreed to split the timber proceeds 50/50.  From 2016 to 2019, Mr. Branscomb gave Mrs. Brown 15 receipts for timber sales. The receipts indicate 32,941 board feet of timber was sold for $15,944.75. The receipts indicate that various species were sold, including 6,745 board feet of tulip poplar and 756 board feet of walnut. One receipt for 2,772 board feet sold for $970.20 does not identify the species. Mrs. Brown's records indicated she received $7,780.39 in timber income from 2016 to 2019. Other records indicated she deposited $10,632.58 in timber income from 2016 to 2019. Mrs. Brown testified that she did not authorize Mr. Branscomb to remove the timber sold per the receipts.  But she was not concerned when he gave them to her because "there wasn't enough money value to really get upset," and she "just thought he took some trees that were in the way or something." When asked if she believed the amounts the lumber mills paid per the receipts were fair and reasonable, she testified, "I am at their mercy.  I assume they're fair people."  When asked if she believed "that the one half that you would be entitled to from those receipts would be fair and reasonable as well," she testified, "I assume Mr. Branscomb was satisfied with it.  So, he's satisfied.  It must okay [sic]."  She is "not the timber person."

{¶9}  Mrs. Brown became suspicious that Mr. Branscomb was conducting logging operations on the farm.  She saw logging equipment at and heard chainsaw noise coming from the farm. Mr. Branscomb told her the noise was coming from other locations.  In July 2019, she asked one of her tenants, Ray Salyers, if Mr. Branscomb was taking timber.

He said yes and gave her trail camera photographs dated June 20, 2016, June 22, 2016, July 19, 2016, July 20, 2016, and October 3, 2016, showing loads of timber on a truck positioned to leave the farm.  He also gave her a photograph from April 7, 2019, which shows a load of timber by the silos.  She went around the farm and saw "fresh cuts," piles of logs, stacks of tree tops, many stumps, and "many roads that had been created that were not supposed to be there."

{¶10}  She hired David Murray, a forester, who found 134 stumps on the farm for trees he estimated were cut between 2016-2019. Mrs. Brown testified that she never authorized Mr. Branscomb to remove 134 trees. She acknowledged that prior to Mr. Brown's death, he was usually the one to give permission for tree removal, but they "kind of talked everything over together."  She testified that between 1997 and her husband's death, Mr. Branscomb "may have cut somethings [sic] at [Mr. Brown's] request.  I am not sure." However, she estimated that she was present for at least 90% of the conversations between Mr. Brown and Mr. Branscomb about the farm and was sure Mr. Brown did not give Mr. Branscomb permission to remove the trees at issue. Mr. Brown "cared a lot about all the trees," and prior to his death, the last time someone had permission to log on the farm was in 2006. After Mr. Brown's second brain surgery it would have been "very difficult" for him to give permission for logging.  He was "delusional at times." She knew she was involved in "anything from 2016" because Mr. Brown "was not able to make decisions for himself," and she "was with him constantly." On August 24, 2019, Mrs. Brown terminated the crop farming lease.  After she sued Mr. Branscomb, he claimed for the first time that he owned the farm.

### 3. Testimony of Farm Tenants

{¶11} Ray Salyers lives on the farm with his son, Ron, and grandson, John. John testified that he set up a trail camera which "takes pictures on a motion capture" on a basketball rim. Whenever he reviewed photographs taken by it, the date and time information was accurate. The camera was there and on from June to October 2016 and was there in 2017, 2018, and 2019. From time to time, he shut it off. He took the April 7, 2019 photograph with his phone. He testified that it was kind of odd for timber to be on a truck in the area depicted because no one usually went there.

{¶12} Ray testified that during the summer of 2016 until Mr. Brown's death, he observed Mr. Branscomb conducting logging operations on the farm. In the evenings and on weekends, there was a "consistent barrage of logging trucks going in and out." After Mr. Brown's death, the operations occurred "in spurts." Ray recalled seeing Mr. Branscomb engage in logging operations around early spring of 2019. The operations were not as intense as before; there were "a few loads here and there, every other day or so." Ray testified that the trail camera was on the basketball hoop in 2016, 2017, 2018, and 2019. But in the fall of 2016, it was sometimes moved to the woods for hunting purposes. There were also times he noticed the camera was off and turned it back on.

{¶13} Ron testified that during the summer of 2016 until Mr. Brown's death, he saw Mr. Branscomb engaging in logging operations on the farm. He did not see Mr. Branscomb cut trees down but saw his equipment and saw him taking timber out in his trucks. He thought the logging operations were more active when the Browns were out of town. Ron also saw Mr. Branscomb take timber off the farm after Mr. Brown died. In total, he had seen at least a dozen loads taken off the farm.

{¶14} Jeff Conley, Jr., also lives on the farm.  During the summer of 2016 until Mr. Brown's death, Conley observed Mr. Branscomb conducting logging operations on the farm. He saw Branscomb Logging trucks and saw Mr. Branscomb driving some of the trucks.  At times, the operations were intense, mainly when the Browns were in California or other places. He saw several loads being taken out. When asked if he observed Mr. Branscomb conducting logging operations on the farm after Mr. Brown's death, Conley testified, "I think he was.  I'm positive.  Date-wise, I may be off, but."  He then testified that he observed Mr. Branscomb conducting logging operations on the farm shortly before he stopped farming there. Those operations were "rapid, fast, load them up and get them out.  Trucks piled full."  The trucks "said Branscomb Logging right on the doors," and he saw Mr. Branscomb driving some of them. There were days he saw seven to nine loads taken out.

4.  Testimony and Exhibits Prepared by David Murray

{¶15} Murray inspected three sites on the farm in 2019. In Unit One, which was on the 451.5 acre parcel, he found 49 tree stumps, 27 of which were walnut.  He estimated that the trees were cut at the end of 2018 or in 2019 because the stumps were "pretty new," there were still chips from the chainsaw laying around, vegetation was smashed down, and he could see skidder tracks.  In Unit Two, which was on the 231.19 acre parcel, he found 42 stumps, 20 of which were walnut.  He estimated that the trees were cut in 2018 because the stumps were more cracked and dried out. In Unit Three, which was on the 231.19 acre parcel, he found 43 stumps, 16 of which were walnut.  He estimated that the trees were cut in 2016 or 2017 because there were stump sprouts, i.e., new growth coming from around the edge of the stumps.  The sites were "real thick areas" with "dense

brush and honeysuckle," so Murray thought he probably missed a lot of stumps.  Murray observed that "much damage" had been done to residual trees, which were broken off and bent over, and that "[s]oil erosion was evident at numerous sites." He opined that "[t]hese stands may never recover, at least for many generations" and that "[m]any years will pass before acceptable woodland conditions return and the soil erosion stabilizes."

{¶16}  Murray testified that the three sites were "all woodland" and were not on the perimeter of a pasture or near crops.  He testified, "These weren't fence-row trees that were cut.  This was - - this was woodland."  His report also states that the sites were "not located in the vicinity of any pastures."  Murray also testified that access to the property is limited, and one would have to go right past the tenants to reach the sites. He had been all around the farm boundary and saw no equipment tracks through the property lines indicating someone accessed the sites a different way. Murray identified tulip poplar, walnut, and maple logs in the 2016 photographs and walnut logs in the 2019 photograph. He testified that none of the logs appeared diseased.

{¶17}  Murray determined board foot volume for each tree, which his report states requires two measurements—tree diameter at breast height and "length of logs cut." Murray testified that breast height is 4.5 feet, and diameter at breast height ("DBH") is used instead of stump diameter because "if you look at the trunk of the tree, it's usually flared at the bottom," and if you go 4.5 feet up, "it's a more uniform figure."  To determine DBH, Murray first determined the average diameter of each stump. He converted the average diameter to DBH using the publication "Estimating Volume from Stump Measurements" by Kenneth L. Quigley. The conversion table from this publication appears in Appendix A of this decision.  To determine length of logs cut, for about 90%

of the trees, he measured from the residual tree top to the edge of the stump. When he could not find a residual tree top, he used average adjacent tree height. Then, he used the Doyle Log Rule, which appears in Appendix B of this decision, to determine board foot volume using DBH and the number of 16-foot logs in the tree. Murray calculated total board feet for the 134 trees to be 43,600, of which 16,980 was walnut, 14,535 was tulip poplar, and the rest was other species.

{¶18} In accordance with industry standards, Murray then used sawlog prices from the Ohio Timber Price Report to determine stumpage value of the trees, i.e., what a landowner would receive for standing timber. He used a price of $2 per board foot for the walnut and prices ranging from $0.20 to $0.77 a board foot for the other species of trees. Based on his calculations, the total stumpage value of the trees was $44,453, which included $33,960 for walnut.

{¶19} However, during his testimony, Murray admitted that he mistakenly used higher DBH figures than he should have based on the average stump diameters he measured and Quigley's publication. He also admitted that Quigley's measurements were based on the stump being one foot off the ground. When asked, "In terms of the stumps that you saw, how close or far from the ground were those usually cut?" Murray testified, "Well, in walnut they cut them right at the ground level. Most of them were cut low." When asked if a measurement at ground level would "be a larger diameter then [sic] it would be for that same tree based on [Quigley's] calculations," Murray testified, "It shouldn't be too much difference." When asked, "A couple of inches probably?" Murray testified, "Yeah." Later, when asked if it was a fair assumption that the diameter of a specific walnut stump he measured as 22 inches would have been 20 inches one foot off the ground, he

testified, "Yeah, it could be." Murray initially testified that "a few inches difference in diameter on a tree only makes a few percent difference in the volume of that log" and that it would not be "over a five percent difference." Later, he testified that his board feet calculations in Exhibit 9, which sets forth total board feet per species, were about 30% over what they really are.

{¶20} Murray also testified that although he thought $2 per board foot for the walnut was reasonable, it was "probably really low." His report states he did not give veneer value to the walnut "since quality can only be determined by inspecting the log." And at one point, when the court stated that it had heard Murray testify "over and over that it's your opinion to a reasonable degree of professional certainty that" $2 per board foot "was the value per board foot of the lumber you observed taken from Ms. Brown's property," Murray responded, "Yes."  However, Murray also testified that veneer-quality walnut was "probably all that was cut," though he could not "prove that," and that he was "sure most of them were prime veneer" which is in the $4 to $8 range. In his report, he opined that "[m]ost of the trees cut were of exceptional quality/value as indicated by the site, large size (DBH), and quality of those trees not cut."  Murray testified that the trees that were left were "pretty nice walnuts," and "loggers don't take lowgrade [sic] walnut logs.  If you have a choice."  He also testified that other loggers told him that "straight run, they're getting three dollars a foot.  That's for every walnut they can find."  So, he knew $2 a foot was fair, but he also thought it was "a bargain," and $3 a foot would be a fair price.

5.  Testimony of Mr. Branscomb

{¶21}  Mr. Branscomb agreed with Mrs. Brown's testimony about the terms of the written crop farming lease, though he indicated the lease was entered in 1996. When asked if the lease term was "a yearly basis" or "some other term," he testified, "The - - a yearly basis. Just renews every year." When asked if the lease ran "from January 1 to December 31 or different dates?" he testified, "Typically, you get a year's notice, if they want to change anything, just anything.  Yes, the December.  When the crop came off, you was already fertilizing for the next year."  When asked if anything was done prior to his receipt of his termination letter on August 24, 2019, which was relevant to future crop farming seasons, he testified, "We went into a seven-year echelon program, with the grid sampling and applying fertilizer for the - - we did the seven-year soil test.  And split that evenly too as well."  He believed Mrs. Brown was obligated to continue the crop farming lease for seven years after they paid for the program in 2018. He testified that he would not have incurred the expense if Mrs. Brown had indicated she did not want to farm "on the halves" with him for seven more years.

{¶22} In 1997, he agreed to provide bushhogging services for $4,360 a year. When he requested payment the first year, the Browns did not pay him. Mr. Brown said he could not afford the payment and told Mr. Branscomb the farm would be his retirement after Mr. Brown died. Mr. Branscomb continued to bushhog in reliance on this promise until 2019, when he completed half the bushhogging before Mrs. Brown terminated him. He testified that it took him "43 hours just to do the pastures." When asked if there was

"just a little bit of extra, like, land that was in the CREPT program?"[2] he testified, "They add that later, in later years, and I ended up doing more than that.  Yes, I did that later."

**{¶23}** There was a separate agreement for Mr. Branscomb and the Browns to split timber proceeds 50/50.  To his knowledge, the proceeds of any timber he harvested had been split.  There was also a separate agreement for cattle services.  He was paid $1,800 a month to care for the cattle and "keep the fence up."  There were times he needed help with those tasks, and per the cattle agreement, the Browns were supposed to pay for the additional labor but never did even though he requested payment. The Browns were supposed to pay the expenses for taking care of the cattle and fences, and he was supposed to use their equipment.  At some point, the old corral fell in, and Mr. Branscomb could not get cattle loaded.  In 2012, he and two helpers started to build a new corral, but after a week, the Browns told him they could no longer afford it, that he would have to pay for the rest of the corral himself, and that he should build it how he wanted because "this farm will be yours." Mr. Branscomb later testified that Mrs. Brown did not promise him the farm but was present when Mr. Brown did.

**{¶24}** Mr. Branscomb testified that he also "kept the driveways up," ran a scraper blade over them, filled in potholes, and "straightened up the creeks."  He was not obligated to do this under the crop farming, cattle, or timber agreements.  He also put gravel down to get farm equipment to two crop fields "in the very back." The equipment had to go through low, swampy areas.  He testified, "We couldn't get it up there.  We were spinning out.  Getting stuck."

---

[2] Evidently the acronym which should have been used here is CREP.  No evidence was presented about what this meant, but the trial court found it is an acronym for Conservation Reserve Enhancement Program.

**{¶25}** Mr. Branscomb testified Exhibit S was "a list of things I done and my own personal equipment that I used when theirs was broke down or they wouldn't fix anything." He testified that services on the list were outside the crop faming, cattle, and timber agreements. He later testified some services on the list were part of the cattle agreement and that the amounts listed were just for the use of his own equipment. The first two items on the list state: "Bushhogging cattle pastures for 22 yrs $94,600" and "Bushhogging CREP fields 14 yrs. $15,904." When asked if the $94,600 figure was "based on that $4,360 per year amount," he testified "I assume it was, yes. Should have been." Later, he indicated he calculated the amount using a custom-hire website. When asked how he calculated the $15,904 figure, he initially testified that he thought he used an hourly rate which he "probably" got from a custom hire website. Then he testified that he used a per acre rate from a custom hire website. He also used rates from a custom hire website to determine other amounts listed in Exhibit S. He did not remember which website. He testified that the website accumulated its data from a survey from five universities and that he did not know the source of the universities' data. Exhibit S also mentioned a "Komatsu track hoe to fix creek" but no dollar amount for it. Mr. Branscomb testified that he rented that "to straighten the creek out" because it was flooding the fields and washing them out. He thought he got the track hoe for $2,400 for one week. He acknowledged that prior to the lawsuit, he did not request that Mrs. Brown pay the amounts listed in Exhibits S. However, he testified that the Browns were aware of almost everything listed in Exhibit S.

**{¶26}** According to Mr. Branscomb, Exhibit T was "a list of the labor I paid to people." Mr. Branscomb also testified that receipts in Exhibit X were for expenses for

which the Browns did not reimburse him with the exception of an expense for harvesting soybeans and corn. He admitted the Browns did not authorize some of these expenses in advance, including (1) $296.40 for gravel on October 27, 2012; (2) $720.80 for gravel on March 25, 2016; and (3) $4,000 for a "SQUEEZE CHUTE, MODEL SO4" and $495 for "AI/PALPATION" on March 25, 2015. The $296.40 and $720.80 in gravel was used to access the back fields. The receipt for the "SQUEEZE CHUTE, MODEL SO4" and "AI/PALPATION" was "for the cattle chute and outpatient cage to treat the cattle in." Regarding a $2,750 receipt for 55 "round bales" on February 20, 2016, he testified that the Browns were "supposed to" pay for hay but ran out and said they would not buy any more, so he paid for it for their cattle.

**{¶27}** Mr. Branscomb also testified about Exhibit Y, another list with dollar amounts. The first two items state "rented post driver 6-15-10–6-16-10 $340" and "rented post driver & skid loader 11-15-12–11-21-12 $1,890." The list also includes "stone put down to get to back fields" and the following amounts: (1) $250 on October 29, 2012; (2) $2,551.20 on September 29, 2016; (3) $720.80 on an unknown date; and (4) $296.40 on October 27, 2012. The list also states "1-20-13 30 rd. bales $1500" and "2-22-16 55 rd. bales $2,750." Mr. Branscomb initially testified that Exhibit Y was a list of "stuff that I rented before I ended up purchasing some equipment" and that it was all used for work on the farm. Later he testified that only the first two items in Exhibit Y were rented. When asked, "Was any of this equipment stuff that, based on any agreement you had with the Browns, you were accepted [sic] to pay for or provided?" he testified, "They - - I ended up paying for everything, but, yes, they were supposed to have -." When asked, "Okay, and the agreement would have been they paid for these things, but they never paid you for

those? he testified, "Right." He testified that he did not give the Browns invoices for anything in Exhibit Y, but it was "their responsibility" to provide him with equipment. Then he testified that he did invoice the Browns prior to the cattle corral incident in 2012. When asked if the amounts in Exhibit Y were "calculated the same way" as in "the past exhibit where you had a different equipment used [sic]," he testified, "Yes." He also testified that the $2,551.20 in gravel was for traction to get to the fields.

### 6. Dismissals and Settlements

**{¶28}** In its February 12, 2024 Decision and Judgment Entry, the trial court made the following findings regarding dismissal and settlements. At the beginning of trial, Mrs. Brown, as trustee of the Defined Benefit trust, and Brown's Paint Valley Farms, LLC, dismissed their claims against Mr. Branscomb. During trial, Mr. Branscomb dismissed his claims against Ray Salyers. The remaining plaintiffs and third-party defendant and Mr. Branscomb reached a settlement regarding calf sale proceeds to partially resolve Counts 12 and 13 of Mr. Branscomb's counterclaim/third-party complaint. They also reached a settlement on his claims regarding the retrieval of his personal property, which partially resolved Count 18 and fully resolved Counts 16, 17, and 19 of his counterclaim/third-party complaint. Upon conclusion of the trial, Mr. Branscomb dismissed Counts 4, 8, 9, 20, 21, 22, and 24 of his counterclaim/third-party complaint.

### 7. Verdict

**{¶29}** The February 12, 2024 Decision and Judgment Entry collectively referred to Mrs. Brown, as trustee of Mrs. Brown's trust, as trustee of Mr. Brown's trust, and individually, as "Brown." The court awarded "Brown" compensatory damages of $32,125.43 and found that "Brown" was entitled to punitive damages of $64,250.86 and

reasonable attorney fees. The court also found "Brown" was entitled to treble damages of $96,376.29 under R.C. 901.51. But "Brown" had to elect whether to recover punitive damages or treble damages. The court concluded the remaining claims in Mr. Branscomb's counterclaim and third-party complaint were meritless and denied them.

**{¶30}** Mrs. Brown, as trustee of Mrs. Brown's trust and Mr. Brown's trust, filed a notice of election to recover punitive damages. On May 3, 2024, the court issued its Final Judgment Entry in which it collectively referred to the "Plaintiffs" as "Brown." The entry states that in the Decision and Judgment Entry, "Brown" was awarded $32,125.43 in compensatory damages, that "Brown" elected to recover punitive damages, that "Brown" is awarded $64,250.86 in punitive damages, and that in accordance with an agreed stipulation, "Brown" is awarded $26,168.75 in attorney fees.

**{¶31}** In the remainder of this decision, we will continue to generally refer to Wendy D. Brown as Mrs. Brown. We will collectively refer to Mrs. Brown as trustee of Mrs. Brown's trust and Mr. Brown's trust as "Trustee Brown." We will collectively refer to Mrs. Brown as trustee of Mrs. Brown's trust, as trustee of Mr. Brown's trust, and individually, as "Brown," as the trial court did in its February 12, 2024 Decision and Judgment Entry, and as Mr. Branscomb does in his appellate brief.

## II. ASSIGNMENTS OF ERROR

**{¶32}** Mr. Branscomb presents two assignments of error:

The trial court erred in its February 12, 2024 decision and judgment entry when dismissing Branscomb's breach of contract and unjust enrichment claims.

The trial court erred in its February 12, 2024 decision and judgment entry and its May 3, 2024 final judgment entry when granting judgment in favor of Brown on Brown's conversion and R.C. 901.51 claims and awarding compensatory damages, punitive damages, and attorney fees.

## III.  FIRST ASSIGNMENT OF ERROR

{¶33}  In the first assignment of error, Mr. Branscomb contends the trial court erred when it dismissed his breach of contract and unjust enrichment claims. He presents manifest weight of the evidence challenges for each claim. In evaluating whether a judgment is against the weight of the evidence, an appellate court

> weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed.

> Moreover, when reviewing the evidence under this standard, we are aware that the weight and credibility of the evidence are to be determined by the trier of fact; we thus defer to the trier of fact on these issues because it is in the best position to gauge the witnesses' demeanor, gestures, and voice inflections, and to use these observations to weigh their credibility. The trier of fact is free [to] believe all, part, or none of any witness's testimony.

> Ultimately, a reviewing court should find a trial court's decision is against the manifest weight of the evidence only in the exceptional case in which the evidence weighs heavily against the decision.

(Citations omitted.) *Wootten v. Culp*, 2017-Ohio-665, ¶ 19-21 (4th Dist.).

{¶34}  "To establish a breach of contract, a plaintiff must prove (1) the existence of a contract, (2) performance by the plaintiff, (3) breach by the defendant, and (4) damages or loss resulting from the breach."  *Beacon Funding Corp. v. CV Transp. & Towing, Inc.*, 2024-Ohio-1993, ¶ 17 (4th Dist.), citing *Lucarell v. Nationwide Mut. Ins. Co.*, 2018-Ohio-15, ¶ 41.

{¶35}  "'[U]njust enrichment is a quasicontractual theory of recovery.'"  *Bender v. Logan*, 2016-Ohio-5317, ¶ 66 (4th Dist.), quoting *Dailey v. Craigmyle & Son Farms, L.L.C.*, 2008-Ohio-4034, ¶ 20 (4th Dist.), citing *Hummel v. Hummel*, 133 Ohio St. 520 (1938), paragraph one of the syllabus.  "Unjust enrichment occurs when a person 'has

and retains money or benefits which in justice and equity belong to another.'" *Id.* at ¶ 67, quoting *Hummel* at 528. ""Because [the plaintiff] is seeking the equitable remedies available under a claim of unjust enrichment, it must show a superior equity so that it would be unconscionable for [the defendant] to retain the benefit.'"" (Bracketed material in original.) *Id.*, quoting *Chesnut v. Progressive Cas. Ins. Co.,* 2006-Ohio-2080, ¶ 30 (8th Dist.), quoting *Directory Servs. Group v. Staff Builders Internatl., Inc.,* 2001 WL 792715 (8th Dist. July 12, 2001). Therefore, to prevail on an unjust enrichment claim, "a plaintiff must demonstrate: '"(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment (unjust enrichment).'"" *Id.*, quoting *Johnson v. Microsoft Corp.*, 2005-Ohio-4985, ¶ 20, quoting *Hambleton v. R.G. Barry Corp.,* 12 Ohio St.3d 179, 183 (1984).

## A. Breach of Contract – Crop Farming Lease

**{¶36}** In his written closing argument, Mr. Branscomb claimed Mrs. Brown, in her individual and representative capacities, breached the crop farming lease "by prematurely terminating" it "without adequate notice and despite inputs for future farming seasons that had already been incurred and paid." He did not elaborate on the notice issue and instead focused on the purchase of the seven-year soil sampling survey. He claimed that he incurred damages of at least $582,674 for crop years 2020 through 2025 due to the premature termination of the crop farming lease.

**{¶37}** The trial court found that no written crop farming agreement had existed since 1997; instead, Mr. Branscomb farmed on an oral agreement that was renewed on an annual basis. The court found Brown terminated the oral agreement on August 24,

2019, and there was no evidence Brown failed to pay Mr. Branscomb "on the halves" for 2019 as contractually required. The court also found R.C. 1335.05 barred a breach of contract claim based on any agreement to extend the farming contract for seven years because there was no writing signed by Brown.

**{¶38}** On appeal, Mr. Branscomb asserts that there was still a written crop farming lease at the time of termination because he and Mrs. Brown both testified that the written lease automatically renewed for one-year terms, so R.C. 1335.05 does not bar his breach of contract claim. He further asserts that "undisputed evidence" shows the lease "required one (1) year advance notice of termination by either party" and that he "had already begun work for the 2020 crop season." Therefore, he asserts that he did not receive sufficient advance notice to terminate the lease for the 2020 crop year, that the lease terminated, "at the earliest, after the 2020 crop year ended," and that we should award him damages for the 2020 crop year.

**{¶39}** The trial court's decision to deny the breach of contract claim regarding the crop farming lease was not against the manifest weight of the evidence. Initially, we observe that because Mr. Branscomb's closing argument did not elaborate on the notice issue and focused on the purchase of the seven-year soil sampling survey, it appears the trial court did the same. In any event, there is no evidence the written lease, even if it was still in effect in 2019 due to an automatic annual renewal provision, required one year advance notice of termination. The written lease is not in evidence. Mrs. Brown testified that she thought the lease "kept going until one of the parties wanted out" and that she did not remember how much notice was required. Mr. Branscomb directs us to the following portion of his testimony:

Q. Okay. And what's your understanding as to when the term of the - - the lease term was? Was it like a yearly basis, or was it some other term?

A. The - - a yearly basis. Just renews every year.

Q. Okay. And did that run from January 1 to December 31 or different dates?

A. Typically, you get a year's notice, if they want to change anything, just anything. Yes, the December. When the crop came off, you was already fertilizing for the next year.

Q. Okay.

A. Yep.

But Mr. Branscomb was not asked, and did not testify, that the lease required one year advance notice of termination. Instead, in response to a question about the dates of the lease term, he gave an unresponsive answer which included vague testimony about "[t]ypically" getting a year's notice for changes. Therefore, Mr. Branscomb did not show the crop farming lease was terminated without adequate notice, and the denial of the breach of contract claim regarding the crop farming lease was not against the manifest weight of the evidence.

### B. Breach of Contract and Unjust Enrichment – Bushhogging Services

**{¶40}** In denying Mr. Branscomb's claims for breach of contract and unjust enrichment regarding bushhogging services, the trial court explained it did not believe Mr. Branscomb's testimony about a promise to either convey the farm to him or pay him $4,360 a year for bushhogging services. The court believed Mrs. Brown's testimony that he assumed bushhogging responsibilities on the farm as part of an agreement to provide cattle care, mowing, and repair services for $1,500 per month, later increased to $1,800 per month. Mr. Branscomb did not dispute that he received all the monthly payments, and

the court found that he failed to prove that he conferred a benefit on Brown for which he was not already compensated. The court also explained that even if it accepted Mr. Branscomb's testimony as true, he "wholly failed to establish a foundation upon which to determine damages." He relied on figures in Exhibit S which he testified were probably from a custom-hire website he could not remember the name of, and reading something on the internet, without more, was an insufficient basis for establishing the value of any benefit retained by Brown.

**{¶41}** Mr. Branscomb maintains there were separate agreements for bushhogging and cattle services: (1) a 1997 agreement to bushhog pastureland for $4,360 per year; (2) a 1998 agreement to provide cattle services for the monthly fee; and (3) a 2005 agreement to bushhog CREP land. He claims Brown acknowledged that he and Mr. Brown entered the first bushhogging agreement before the Browns approached him about the cattle services agreement and that Brown was not fully aware of the terms of the bushhogging agreement. He asserts the court improperly merged the bushhogging and cattle services agreements to conclude he was compensated for bushhogging services via monthly payments he received for cattle services. He claims he is entitled to $94,600 for bushhogging the pastureland for 22 years at the agreed rate of $4,360 a year.[3] He claims he is entitled to $15,904 for bushhogging the CREP land for 14 years based on an average custom-hire rate from survey data collected and published by 5 universities. He asserts the custom-hire rates he relied on are at https://farmoffice.osu.edu/farm-management/custom-rates-and-machinery-costs.

---

[3] $4,360 x 22 is $95,920, not $94,600. Mr. Branscomb testified that he only completed half the bushhogging in 2019. But even if he was owed $4,360 for 21 years and half of $4,360, or $2,180, for the last year, the total would be $93,740, not $94,600.

**{¶42}** The trial court's denial of the breach of contract and unjust enrichment claims for bushhogging services was not against the manifest weight of the evidence. The trial court was free to reject Mr. Branscomb's testimony about separate agreements for cattle services and bushhogging services and believe Mrs. Brown's testimony that bushhogging services were part of the monthly payment agreement. *Wootten*, 2017-Ohio-665, ¶ 20 (4th Dist.) ("The trier of fact is free [to] believe all, part, or none of any witness's testimony"). Mrs. Brown never admitted otherwise. Mr. Branscomb directs us to the following portion of her testimony:

> Q: In terms of the bush hogging that went on the property, that was started shortly after Mr. Branscomb started into crop farming?
>
> A: I - - my husband did the bush hogging for quite awhile and as I stated earlier once we bought the golf course in '97 and I broke my leg in '98, John was overwhelmed and that's when he approach [sic] Mr. Branscomb about taking on and the mowing was included. I can't tell you whether he was paid extra for bush hogging before 1998 because, as I said, John handled the books.

Mrs. Brown admitted she did not know if Mr. Brown paid Mr. Branscomb to do any bushhogging prior to 1998, but she never changed her testimony that beginning in 1998, it was part of the monthly payment agreement. There is no dispute that Mr. Branscomb received the promised monthly payments. Thus, as the trial court found, Mr. Branscomb failed to prove he conferred a benefit for which he was not already compensated.

### C. Breach of Contract and Unjust Enrichment – Cattle Services

**{¶43}** In his written closing argument, Mr. Branscomb asserted Mrs. Brown breached the cattle services contract and/or was unjustly enriched by the cattle services he provided and/or paid for by failing to transfer title to the farm to him. Alternatively, he asserted he was entitled to recover amounts he paid or incurred for additional labor and

other services related to the performance of cattle services. He claimed that as set forth in Exhibit S, his unpaid/unreimbursed costs associated with cattle services were at least $5,280, as set forth in Exhibit T, he incurred additional labor costs for repairing/building fences of at least $5,780, as reflected in Exhibit X, he incurred at least $19,640.20 in costs for materials, and as reflected in Exhibit Y, he incurred at least $9,605 in equipment costs. He claimed "[t]he total amount of these unreimbursed labor and material costs is $40,305.20." (Emphasis deleted.)

### 1. Breach of Contract

**{¶44}** In denying the breach of contract claim, the trial court explained that there was no dispute that for over 20 years, Brown paid Mr. Branscomb a monthly fee to care for her cattle and incentivized the agreement by paying him 5% of calf sale proceeds. The court found no credible evidence that the Browns agreed to pay him anything beyond that as consideration for the care of the cattle. Thus, there was no evidence any contract relating to the cattle was breached.

**{¶45}** Mr. Branscomb contends the trial court's finding that there was no credible evidence that the Browns agreed to pay anything beyond the monthly fee and 5% of the calf sale proceeds is against the weight of the evidence. He asserts that there is credible evidence because Mrs. Brown admitted that prior to 2012, Mr. Brown reimbursed him for amounts he paid out of pocket for cattle supplies and labor. He directs us to the following testimony by Mrs. Brown:

> Q. And in the course of taking care of the cattle, he had used additional labor and you had paid him for additional before. Correct?
>
> A. I don't remember paying him. I - - John did almost all the books on the farm until he had the seizure in 2014 and then I had to come in and help write the checks and step in.

In this excerpt, Mrs. Brown did not testify that Mr. Branscomb had ever been reimbursed for cattle supplies or additional labor.  Notably, Mr. Branscomb testified that the Browns never reimbursed him for additional labor when he needed help with his cattle-related duties. Therefore, the trial court's denial of the breach of contract claim was not against the manifest weight of the evidence.

## 2.  Unjust Enrichment

**{¶46}** In denying the unjust enrichment claim, the court explained that the $40,305.20 Mr. Branscomb sought was inflated because it included items in Exhibits X and Y which the parties agreed Mr. Branscomb could remove from the farm and retain for himself. The court also found Mr. Branscomb failed to prove he conferred a benefit on Brown for which he was not adequately compensated. The court explained that at a minimum, from 1998 through August 24, 2019, Brown paid Mr. Branscomb $327,000 for cattle care, mowing, and maintenance services ($1,500 x 248 months).  The court found that even if only one-third of that amount was for cattle care, he received at minimum $124,000 for cattle care.  In addition, he received 5% of calf sale proceeds. The court found that Brown conceded at trial that Mr. Branscomb was owed $2,034.90 as his percentage of calf sales for 2019, and extrapolating from that amount, the court found he could potentially have earned an additional $42,732.90 in incentives ($2,034.90 x 21 years).  So even if he "chose to invest $40,305.20 [of] his own money in furtherance of the cattle venture, he still ended up with a net gain."  The court found that whether he was "now satisfied with the return on his investment is inconsequential" and that Brown had not retained a benefit under circumstances were it would be unjust for her to do so without further payment to Mr. Branscomb.

{¶47} Mr. Branscomb contends that the weight of the evidence showed that he conferred a benefit on Brown by (1) renting equipment or using his personal equipment to perform cattle-related services because the Browns' equipment was not always operable and available for his use; (2) buying 85 hay bales to feed the cattle when the Browns did not have hay; and (3) buying a chute to treat the cattle.　He claims the rental costs and average custom hire values for the use of his personal equipment total $80,555.75, which he bases on figures in Exhibit S totaling $78,325.75, and figures totaling $2,230 from Exhibit Y for the rental of two post drivers and a skid loader. He asserts this amount excludes cattle equipment in Exhibits X and Y which "the Trial Court indicated [he] could retain."　He also claims he spent $4,250 on hay and $4,495 on the chute. Mr. Branscomb asserts that Brown unjustly retained these benefits by failing to reimburse him for the equipment and supply costs. He maintains that the trial court's statements about how he cannot complain about his out-of-pocket expenses because he got a net gain from cattle services are not based on any evidence. He contends the monthly fee he received was for his personal labor in caring for the cattle and maintaining fences. He claims there is no evidence he agreed to pay for supplies or equipment to care for the cattle. And he claims the conclusion that Brown did not have to reimburse him for cattle expenses because he "had gross earnings of at least $124,000.00 from caring for the cattle, resulting in net income of $34,699.25 (i.e., $124,000.00 minus $89,300.75 out of pocket expenses) for 22 years of his labor that equals $1,577.24 per year and $4.32 per day, demonstrates that the Trial Court lost its way."

{¶48} The trial court's denial of the unjust enrichment claim was not against the manifest weight of the evidence.　Initially, we observe that in his written closing argument

Mr. Branscomb argued he was entitled to "at least $5,280" from Exhibit S for cattle services and requested most of the figures in Exhibit S as damages for his unjust enrichment claim for improvements. On appeal, he requests most of the figures in Exhibit S as damages for cattle services.

{¶49} In any event, the trial court found that Exhibit S was "insufficient to establish the value of any benefit conferred upon Brown," and it did not err in making this finding. The figures in Exhibit S which Mr. Branscomb seeks to recover for cattle services are not based on Mr. Branscomb's personal knowledge; they are based on his review of hearsay information from an unidentified website which was not introduced into evidence. *See generally St. Paul Fire & Marine Ins. Co. v. Ohio Fast Freight, Inc.*, 8 Ohio App.3d 155 (10th Dist. 1982) (trial court did not err in finding plaintiff failed to maintain burden of proof regarding extent and amount of damages where witness's testimony on such matters was not based on personal knowledge but on a review of hearsay business records which were not introduced into evidence). Mr. Branscomb cites the website he purportedly used in his appellate brief, but "[a] reviewing court cannot add matter to the record before it, which was not a part of the trial court's proceedings, and then decide the appeal on the basis of the new matter." *State v. Ishmail*, 54 Ohio St.2d 402 (1978), paragraph one of the syllabus.

{¶50} The figures listed in Exhibit Y for the rental of the two post drivers and skid loader suffer from the same flaw as the figures in Exhibit S. Although Mr. Branscomb suggests the figures listed in Exhibit Y are what he paid to rent the post drivers and skid loader, he does not direct us to testimony to that effect. When asked if the amounts in Exhibit Y were "calculated the same way" as in "the past exhibit where you had a different

equipment used [sic]," he testified, "Yes." In doing so, Mr. Branscomb indicated the figures for rental equipment in Exhibit Y were based on custom-hire rates from the same unidentified website he used to create Exhibit S rather than on amounts he actually paid to rent the equipment.

{¶51} The remaining expenses for which Mr. Branscomb seeks damages on appeal for unjust enrichment for cattle services are the cattle chute and two purchases of hay. Although the cattle chute and hay purchases are listed in Exhibit Y, contrary to what Mr. Branscomb testified, other evidence indicates the figures listed for those purchases are not based on rates from an unknown custom-hire website. Mr. Branscomb provided a receipt for the cattle chute. He also provided a receipt for one of the hay purchases. Although he did not provide a receipt for the other hay purchase, his testimony suggests custom-hire rates relate to equipment use, and hay is not equipment.

{¶52} Mr. Branscomb admitted the Browns did not authorize the purchase of the cattle chute in advance, and there is no evidence that the cattle could not be treated without the chute, which notably, Mr. Branscomb did not purchase until 2015, over 15 years after he began to care for the cattle. When asked about one of the hay purchases, Mr. Branscomb testified that the Browns were supposed to pay for hay but ran out and said they would not buy any more, so he paid for it for their cattle. He did not testify about why he made the other hay purchase. There is no evidence the Browns did not have other food available for the cattle at the time of either purchase. Thus, it is not evident that Mr. Branscomb purchased the cattle chute or hay for reasons other than to make his job of caring for the cattle easier, a job for which he was already compensated, or to increase profits from calf sales, from which he received 5% of the proceeds. The extent

to which Mr. Branscomb's purchases impacted calf sales is unknown, but as the trial court pointed out, whether Mr. Branscomb is now satisfied with the return on his investment is inconsequential.  The evidence does not heavily weigh against the court's conclusion that Brown has not retained a benefit under circumstances where it would be unjust to do so without further payment.

### D.  Unjust Enrichment – Improvements

**{¶53}** In his written closing argument, Mr. Branscomb asserted that Brown had been unjustly enriched by improvements he made to the farm and her failure to transfer title to it.  Alternatively, he argued that he was "entitled to recover the amounts for his labor and costs that he paid for the labor and materials for the improvements performed on the Premises."  He asserted that "[a]s set forth in [his] list of services (Branscomb Trial Exhibit 'S'), the costs associated with those improvements (excluding costs associated with bushhogging and cattle services) is at least $85,577.75."  (Emphasis deleted.)

**{¶54}** In denying the unjust enrichment claim for improvements, the trial court stated that Mr. Branscomb alleged he performed additional services and improvements on the farm and that Brown had to transfer title to the farm to him *and* compensate him for the services and improvements. The court found these alleged obligations were contradictory under Mr. Branscomb's theory of the case. The court also found Mr. Branscomb had received the compensation due him under his agreements with Brown. In addition, the court found that Mr. Branscomb relied on Exhibit S to claim damages but it was insufficient to establish the value of any benefit conferred upon Brown.  Thus, the court found that Mr. Branscomb failed to prove that Brown had retained a benefit under circumstances where it would be unjust to do so without further payment to him.

{¶55} Mr. Branscomb contends evidence shows he improved the farm by maintaining driveways, straightening the creek, and putting down gravel for better access to fields and pastures. He asserts these things were not required by his agreements with the Browns. And he claims he established the value of these benefits because he testified that he obtained the custom-hire rate of $5,500 for 22 years of driveway improvement work from survey data collected and published by five universities and provided testimony and/or receipts to show he rented a track hoe for $2,400 to straighten out the creek and paid $3,818.40 for the gravel.

{¶56} The trial court's denial of Mr. Branscomb's unjust enrichment claim with respect to the driveway improvement work was not against the manifest weight of the evidence. As we previously explained, the trial court did not err in finding that Exhibit S, which includes the $5,500 Mr. Branscomb seeks for driveway improvement work, is insufficient to establish the value of any benefit conferred by Brown. The figure is not based on Mr. Branscomb's personal knowledge; it is based on his review of hearsay information from an unidentified website which was not introduced into evidence.

{¶57} The trial court's denial of Mr. Branscomb's unjust enrichment claim with respect to the alleged $2,400 track hoe rental and purchase of $3,818.40 in gravel is against the manifest weight of the evidence because none of the court's reasons for denying the claim applies to these alleged expenses. Even if Mr. Branscomb alleged that Brown had contradictory obligations, it is unclear what that has to do with the elements of an unjust enrichment claim for the alleged track hoe rental and gravel purchases. Moreover, Mr. Branscomb did not receive compensation for renting the track hoe or purchasing gravel under his agreements with the Browns. There is no evidence that Mr.

Branscomb was required to make such expenditures under the agreements related to the cattle, fences, and general farm maintenance, or timber. The crop farming lease did require that he provide equipment and split expenses with the Browns. But while the alleged track hoe rental and gravel purchases were made due to the impact the creek and swampy land were having on farm operations, those expenses were not directly related to farming. And Mr. Branscomb specifically testified that he was not required to straighten the creek under the crop farming agreement.

{¶58} In addition, the court's finding that Exhibit S was insufficient to establish the value of any benefit conferred upon Brown is irrelevant to the alleged track hoe rental and gravel purchases. This finding was based on Mr. Branscomb's use of custom-hire rates from an unknown website. The track hoe rental is mentioned in Exhibit S, but the exhibit states no value for it based on a custom-hire rate. Instead, Mr. Branscomb testified that he thought he got the track hoe for $2,400 for one week. The gravel purchases are not included in Exhibit S. We observe that the gravel purchases are listed in Exhibit Y, and as we previously explained, Mr. Branscomb gave testimony indicating figures in Exhibit Y were calculated the same way as figures in Exhibit S. But other evidence indicates the figures listed for those purchases are not based on rates from an unknown custom-hire website, like figures listed in Exhibit S. Mr. Branscomb provided receipts for two of the four gravel purchases, gave check numbers for two purchases (one which he provided a receipt for and one which he did not), and his testimony suggests custom-hire rates relate to equipment use, and gravel is not equipment.

### E.  Summary

**{¶59}**  We sustain the first assignment of error to the extent it challenges the denial of the unjust enrichment claim for improvements, but only as to the alleged $2,400 track hoe rental to straighten the creek and the alleged gravel purchases of $3,818.40.  That decision is against the manifest weight of the evidence.  We overrule the first assignment of error in all other respects.

**{¶60}**  App.R. 12(C)(1) states that when a civil action is tried to the trial court and a majority of judges hearing the appeal

> find that the judgment or final order rendered by the trial court is against the manifest weight of the evidence and have not found any other prejudicial error of the trial court in any of the particulars assigned and argued in the appellant's brief, and have not found that the appellee is entitled to judgment or final order as a matter of law, the court of appeals shall reverse the judgment or final order of the trial court and either weigh the evidence in the record and render the judgment or final order that the trial court should have rendered on that evidence or remand the case to the trial court for further proceedings.

Aside from another manifest weight of the evidence issued discussed below, we have not found any other prejudicial error of the trial court, and we do not find that the appellees are entitled to judgment or final order as a matter of law.  It appears the trial court did not specifically consider whether Mr. Branscomb was entitled to recover for the alleged expenditures for the track hoe and gravel because he did not explicitly mention them in his closing argument.  The trial court made no factual findings pertinent to these expenditures from which we can discern what evidence, if any, the trial court found credible with respect to them.  Therefore, we remand to the trial court for further proceedings as to the unjust enrichment claim for improvements, but only as to the

alleged $2,400 track hoe rental to straighten the creek and the alleged gravel purchases of $3,818.40.

## IV.  SECOND ASSIGNMENT OF ERROR

{¶61} In the second assignment of error, Mr. Branscomb contends the trial court erred when it granted judgment in favor of Brown on Brown's conversion and R.C. 901.51 claims and awarded compensatory damages, punitive damages, and attorney fees.  He maintains that: (1) the judgment on the conversion and R.C. 901.51 claims was not supported by sufficient evidence and was against the manifest weight of the evidence; (2) the compensatory damages calculation is inaccurate, not based on acceptable methodology, and was against the manifest weight of the evidence; (3) the trial court erred in awarding punitive damages and reasonable attorney fees; and (4) the trial court erred in calculating the amount of attorney fees to award relative to its punitive damages award.

{¶62} "Sufficiency of the evidence is a legal question evaluating the adequacy of the evidence." *R.G. v. R.M.*, 2017-Ohio-8918, ¶ 9 (7th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).  "The question is whether the evidence, if believed, is sufficient proof of the elements; an evaluation of witness credibility is not involved in a sufficiency review." *Id.*, citing *State v. Yarbrough*, 2002-Ohio-2126, ¶ 79, 82. "Sufficiency involves the burden of production rather than the burden of persuasion."  *Id.*, citing *Thompkins* at 390 (Cook, J., concurring).  "The evidence and all rational inferences are evaluated in the light most favorable to the [claimant], and a judgment is not reversed on sufficiency grounds unless the reviewing court determines no rational fact-finder could find the existence of the elements by the relevant burden of proof."  *Id.*, citing *State v.*

*Filiaggi,* 86 Ohio St.3d 230, 247 (1999); *State v. Goff*, 82 Ohio St.3d 123, 138 (1998). We set forth the standard of review for a manifest weight of the evidence challenge above.

**{¶63}** "'The adoption of the appropriate measure of damages presents a legal question which we review de novo.'" *Scioto Land Co. v. Knaff*, 2023-Ohio-4821, ¶ 23 (4th Dist.), quoting *Outer Space Signs, LLC v. Clagg*, 2013-Ohio-4350, ¶ 7 (4th Dist.).

**{¶64}** "We review the trial court's award of attorney fees under an abuse of discretion standard." *Barker v. McCoy*, 2015-Ohio-3127, ¶ 32 (4th Dist.), citing *Bittner v. Tri–County Toyota, Inc.,* 58 Ohio St.3d 143, 146 (1991), *modified on other grounds by Phoenix Lighting Group, L.L.C. v. Genlyte Thomas Group, L.L.C.*, 2020-Ohio-1056, paragraph one of the syllabus. An abuse of discretion is "an unreasonable, arbitrary, or unconscionable use of discretion, or . . . a view or action that no conscientious judge could honestly have taken." *State v. Brady,* 2008-Ohio-4493, ¶ 23.

### A. Trial Court's Decision and Judgment Entries

**{¶65}** In its February 12, 2024 Decision and Judgment Entry, the trial court assigned the same meaning to the term "Brown" as we have in this decision—Mrs. Brown as trustee of Mrs. Brown's trust, as trustee of Mr. Brown's trust, and individually. The court found that Brown was the owner with the right to possession to the parcels at issue and owned the trees growing on her land as part of her real property. The court found Mr. Branscomb "converted trees belonging to Brown by removing them without Brown's knowledge or permission; selling them; and withholding the proceeds from Brown." The court found that from 2016 to 2019, he removed at least 134 trees, that the trees were not obstructing farming operations, and that he did not have permission to remove them as nuisance trees. The court found that initially, Murray calculated the total stumpage

value of the trees as $44,453 but testified that his calculations of board footage were 30% too high and that the price for walnut should have been $3 per board foot instead of $2. After adjusting Murray's calculations accordingly, the court found the total stumpage value of the timber Mr. Branscomb removed was $42,951.86. The court reduced this amount by $10,826.43, the amount of timber payments it found Mr. Branscomb had made, awarded Brown compensatory damages of $32,125.43, and found that Brown was entitled to punitive damages of $64,250.86 and reasonable attorney fees. The court also found Brown was entitled to treble damages of $96,376.29 under R.C. 901.51. However, Brown had to elect whether to recover punitive damages or treble damages.

{¶66} On May 3, 2024, the court issued its Final Judgment Entry in which it collectively referred to the "Plaintiffs," presumably referring to Trustee Brown as the court previously found the other two plaintiffs dismissed their claims, as "Brown," stated that "Brown" was awarded $32,125.43 in compensatory damages in the Decision and Judgment Entry, that "Brown" elected to recover punitive damages, that "Brown" is awarded $64,250.86 in punitive damages, and that in accordance with an agreed stipulation, "Brown" is awarded $26,168.75 in attorney fees.

{¶67} Although the trial court's assignment of different meanings to the term "Brown" is confusing, we interpret the Final Judgment Entry as correcting the inclusion of Mrs. Brown, in her individual capacity, in the February 12, 2024 Decision and Judgment Entry's compensatory damages award for conversion and findings of entitlement to punitive damages, reasonable attorney fees, and treble damages under R.C. 901.51. Mrs. Brown made no claims in her individual capacity, presumably because she did not own the two parcels from which the trees were removed in her individual capacity. As a

result, from this point forward, when discussing the trial court's findings on the conversion and R.C. 901.51 claims and Mr. Branscomb's arguments regarding them, we will replace any of their references to "Brown" with "Trustee Brown" to avoid further confusion.

### B. Conversion Claim

**{¶68}** "The elements of a conversion claim are: (1) a plaintiff's ownership or right to possession in property at the time of conversion; (2) defendant's conversion by a wrongful act or disposition of the plaintiff's property rights; and (3) damages." *Pertuset v. Hull*, 2022-Ohio-2348, ¶ 33 (4th Dist.), citing *Mitchell v. Thompson*, 2007-Ohio-5362, ¶ 37 (4th Dist.). Mr. Branscomb challenges the second and third elements.

### 1. Conversion by Wrongful Act or Disposition

**{¶69}** Mr. Branscomb contends the conclusion that he converted the trees by a wrongful act or disposition of Trustee Brown's property rights is not supported by sufficient evidence and is against the manifest weight of the evidence. He asserts that there is a dearth of evidence that he harvested the timber at issue, and even if he did there is no evidence that Mr. Brown did not give him permission to harvest the trees. He asserts evidence shows he had permission.

**{¶70}** The trial court's conclusion that Mr. Branscomb converted at least 134 trees by a wrongful act or disposition of Trustee Brown's property rights is supported by sufficient evidence and was not against the manifest weight of the evidence. There is evidence that at least 134 trees were removed from three areas on the farm between 2016 and 2019 and that Mr. Brown removed them. Murray went around the farm boundary and saw no equipment tracks through the property lines indicating that someone accessed the sites other than by the driveway which went past the tenants.

Tenants observed Mr. Branscomb engaging in logging operations on the farm during the relevant time frame. Ray Salyers described seeing a "consistent barrage of logging trucks going in and out" in the evenings and on weekends during the summer of 2016 until Mr. Brown's death. Ron Salyers thought the operations were more active when the Browns were out of town. Conley observed intense operations when the Browns were in California or other places. After Mr. Brown's death, the three men observed Mr. Branscomb engage in additional logging operations.

**{¶71}** Photographic evidence indicates logging operations occurred when the Browns went to California (June 20 and 22, 2016), when Mr. Brown was bedridden (July 19 and 20, 2016), and two days before his death, when he was in palliative care (October 3, 2016). Mr. Branscomb knew when the Browns were gone because he cared for their dog when they went away. Mr. Branscomb claims there is good reason to believe the dates on the trail camera photographs were ten days off based on the timber receipts in Exhibit 7, but John Salyers testified that whenever he reviewed photographs from the camera, the date and time information was accurate. And while the trail camera did not capture the transportation of all the timber at issue off the farm, there was some evidence that the camera was not on all the time.

**{¶72}** Mr. Branscomb asserts that Trustee Brown "discovered at trial that other people" had been harvesting timber without her knowledge or permission. He directs our attention to testimony he gave, after being recalled to the stand for the limited purpose of testifying about newly discovered evidence, that he saw someone cutting timber on the farm on and off since Mr. Brown's death. But the court did not allow that testimony because it did not pertain to newly discovered evidence. He also directs our attention to

an exhibit the trial court did not admit into evidence. In addition, he directs our attention to evidence that someone removed timber from the farm in January 2022, but that time frame is not relevant to the trees at issue, which were cut years earlier. There is no evidence anyone took timber from the farm during the relevant time period other than Mr. Branscomb.

{¶73} Although Mr. Branscomb had permission to remove certain trees, there is evidence the trees at issue did not fall within those categories. Murray testified that logs in the photographic evidence did not appear diseased. He also testified that the sites from where trees were removed were "all woodland" and were not on the perimeter of a pasture or near crops. Mr. Branscomb claims Murray testified that he may have had permission from Mr. Brown to harvest the trees at issue "due to their type, condition, and/or location." He directs us to a portion of the transcript in which Murray was asked if an aerial map changed his mind about whether Unit One had any pasture area, and he testified, "This part here is pasture. I really don't know. I know this was all big timber." He then testified, "It's woodland conditions. This is fields and you can see on your aerial photo." When asked if there was an "open area to the right, northeast of that, where you marked in red," he testified, "Yeah, I don't know where the fences are. I know there's a fence here." It is unclear what areas of the aerial map Murray was referring to when he made these statements, and we cannot conclude from this testimony that Murray changed his earlier testimony. Nor can we ascertain from the aerial map whether Unit One is on the perimeter of a pasture. Mr. Branscomb directs us to his own testimony that a clearing to the right of Unit One is a pasture area, but the trial court was free to believe Murray's earlier testimony over that of Mr. Branscomb. And we observe that even if there

was a pasture area to the right of Unit One, the trial court had no obligation to believe that roughly 20 years after Mr. Branscomb started caring for the cattle, 49 trees in Unit One suddenly began to interfere with the cattle portion of the farm operations.

{¶74} Mrs. Brown testified that she did not authorize Mr. Branscomb to remove 134 trees, and there is circumstantial evidence that Mr. Brown did not do so. Mrs. Brown testified that Mr. Brown "cared a lot about all the trees," and prior to his death, the last time she was aware of someone having permission to log on the farm was in 2006. She also testified that she and Mr. Brown "kind of talked everything over together." And after his second brain surgery in March 2016, it would have been "very difficult" for him to give permission for logging. He was "delusional at times," and "not able to make decisions for himself." Evidence that Mr. Branscomb's logging operations were more intense when the Browns were away suggests that he tried to conceal them from the Browns, as does the fact that he told Mrs. Brown chainsaw noise she heard coming from the farm was coming from other locations.

{¶75} Although Mrs. Brown accepted payments for timber Mr. Branscomb harvested between 2016 and 2019, that fact does not prove he had permission to cut down the 134 trees at issue. Mrs. Brown testified that when she accepted the payments, she was not concerned about the cutting because "there wasn't enough money value to really get upset," so she thought he just "took some trees that were in the way or something." She "didn't know there was a logging operation going on." And as discussed below, not all the timber taken is accounted for in the receipts Mr. Branscomb gave Mrs. Brown. One can reasonably infer that Mr. Branscomb gave Mrs. Brown half the proceeds

from some timber sales to avoid suspicion regarding the true scope of his logging operations.

## 2. Compensatory Damages

{¶76} Mr. Branscomb contends Trustee Brown failed to establish damages for her conversion claim, and even if she did, the trial court's calculation of them was inaccurate, not based on acceptable methodology, and against the manifest weight of the evidence. Mr. Branscomb asserts that Murray realized there were two significant errors with his calculations during his testimony. First, he misread Quigley's table, so the DBH figures he used were two to four inches higher than they should have been for the stump diameters Murray measured. Second, Murray did not properly follow Quigley's methodology because he used stump diameters at ground level instead of one foot off the ground. Mr. Branscomb claims that because stump diameter at ground level is larger than at one foot off the ground, Murray admitted the stump diameters in his report were inaccurate and estimated that the diameters of stumps at one foot off the ground would be two to four inches less than the diameters at ground level Murray listed in his reports.

{¶77} Mr. Branscomb asserts that instead of calculating the true stumpage value of the trees, the trial court relied on Murray's guess about the difference between the inaccurate stumpage values in his report and the true stumpage values. Mr. Branscomb asserts that when the stump diameters Murray measured for almost every tree are reduced by three inches,[4] a total of 24,977.50 board feet of timber was harvested. Mr.

---

[4] In his calculations, Mr. Branscomb reduced the stump diameter for one walnut tree by only two inches— a tree Murray measured as having a 22 inch diameter stump and testified it could be a fair assumption that its diameter would have been 20 inches at one foot off the ground. Mr. Branscomb evidently endeavored to reduce all the other stump diameters Murray measured by three inches, but he did not do so for three of the sassafras trees. It appears he mistakenly reduced the identification numbers Murray assigned to those stumps by three instead of the stump diameters Murray measured.

Branscomb asserts that the evidence shows Trustee Brown received payment for 32,941 board feet harvested by him during the relevant time period, so she has already received payment for any timber he harvested from the three units and has no damages.

**{¶78}** Mr. Branscomb also asserts that using his board feet calculations for each species and the prices in Murray's Total Timber Volume/Value Summary, which are based on the Ohio Timber Price Report, the total stumpage value is only $23,464.95, which includes $17,320 for black walnut price at $2 per board foot. Mr. Branscomb suggests a price of $3 per board foot is excessive because Murray indicated that using prices in the Ohio Timber Price Report was the industry standard and "repeatedly testified that his $2.00 per board value for walnut was reasonable, and that he could not determine the quality of the harvested walnut trees by looking at their stumps." And Mr. Branscomb asserts that even though the total stumpage value he calculated exceeds the payments Trustee Brown received, she agreed to split the timber proceeds equally with him, he split all the proceeds equally with her, she accepted the payments, and she "believed the amounts that they received for the cut timber were reasonable."

**{¶79}** Even if we agreed with Mr. Branscomb's calculation of total board feet, the receipts he gave Mrs. Brown do not include all the trees at issue. Per Mr. Branscomb's calculations, 8,660 board feet of walnut and 9,020 board feet of tulip poplar were removed. The receipts Mr. Branscomb gave Mrs. Brown reflect the sale of only 756 board feet of walnut—the most expensive species of tree removed from the farm per Murray's testimony—and 6,745 board feet of tulip poplar. Even if the receipt for 2,772 board feet of an unknown tree species is considered, the receipts still would not account for all the missing walnut and tulip poplar.

**{¶80}** Moreover, the trial court did not err in determining that the appropriate measure of damages was the stumpage value of the 134 trees. The court did not find that the trees at issue were covered by the 50/50 timber agreement, so Trustee Brown is not limited in her recovery to 50% of the sale proceeds. "'Normally, when assessing damages for a trespass that includes the cutting of trees, a property owner has three options for recovery: (1) diminution in fair market value of the property; (2) cost of restoring the property to its pre-trespass condition, so long as that value is not grossly disproportionate to the property's value; or (3) the stumpage value of trees that the trespasser has caused to be cut.'" *Selbee v. Van Buskirk*, 2018-Ohio-1262, ¶ 29 (4th Dist.), quoting *Francis v. Wilson*, 1999 WL 33507, *7 (4th Dist. Jan. 25, 1999). "'The damaged property owner is entitled to only one measure of damages and must elect which measure he or she seeks to recover.'" *Id.*, quoting *Francis* at *7. And here, Trustee Brown sought the stumpage value of the trees.

**{¶81}** There is sufficient evidence to support the trial court's calculation of total stumpage value. The trial court indicated it reduced Murray's board feet calculations for each species by 30% and multiplied the new board feet totals by the prices per board foot he used in his calculations, except for the price for walnut, which the court increased from $2 to $3 per board foot. This approach is supported by Murray's testimony that his board feet calculations in Exhibit 9, which sets forth total board feet for each species, would be about 30% over what they really are, and testimony that $3 a foot would be a fair price for the walnut.

**{¶82}** The trial court's use of a price of $3 per board foot for the walnut is also not against the manifest weight of the evidence. Murray did testify that in accordance with

industry standards, he used sawlog prices from the Ohio Timber Price Report in his calculations to determine stumpage value of the trees, that $2 per board foot was reasonable for the walnut, and that he could not determine the quality of the trees by looking at the stumps. However, even though Murray could not definitively determine quality because Mr. Branscomb took the logs, Murray explained the basis for his inference that they were high quality and opined that $3 a foot was a fair price.

**{¶83}** Nonetheless, we agree with Mr. Branscomb that the trial court's calculation of total stumpage value, and thus the amount of the compensatory damages award, is against the manifest weight of the evidence, though we do not adopt his calculations. The evidence shows that at least for the walnut trees, Murray's estimate that his board feet calculations were about 30% too high is inaccurate. Murray calculated the total board feet of walnut as 16,980. The trial court indicated it reduced this amount by 30%, which would have been 11,886, and multiplied that figure by $3 to calculate the total stumpage value for the walnut trees, which would have been $35,658.

**{¶84}** However, Murray admitted that the figures in Quigley's table for converting stump diameter to DBH were based on stump diameters taken at one foot off the ground. Murray admitted that the walnut trees were cut "right at the ground level." He did not testify, as Mr. Branscomb claims, that this meant the stump diameters he measured were two to four inches higher than what they would have been at one foot off the ground. But he did admit that at ground level, stump diameter would probably be a couple of inches larger than stump diameter at one foot off the ground. And when asked if it was a fair assumption a specific walnut stump he measured as 22 inches in diameter would have been 20 inches in diameter one foot off the ground, he testified, "Yeah, it could be." Based

on this testimony, it is evident that the stump diameters Murray used in his calculations for the walnut trees were at least two inches higher than they should have been, but it is not clear that they were three or four inches higher than they should have been. As indicated in Appendix C to this decision, when the walnut stump diameters Murray used in his calculations are reduced by two inches, the total board feet for the walnut trees is 9,760, which at $3 per board feet, would have a total stumpage value of $29,280. Thus, the trial court's compensatory damages award, which was based in part on a value of $35,658 for the walnut trees, was at least $6,378 too high.

{¶85} With regard to the other tree species, we are unable to evaluate the accuracy of Murray's estimate that his board foot calculations were about 30% higher than they should have been. Murray did not testify that any other species were cut at ground level. He admitted that "[m]ost of them were cut low" but did not quantify how much larger the diameter would be for a low stump as opposed to a stump one foot off the ground. Even if Murray's 30% estimate is accurate for the other tree species, the amount of the compensatory damages award is still against manifest weight of the evidence because it includes an excessive amount for the walnut trees. Accordingly, we reverse the compensatory damages award and remand for the trial court to determine the appropriate amount of compensatory damages due Trustee Brown.

### 3. Punitive Damages

{¶86} Mr. Branscomb contends the trial court erred in awarding punitive damages. He claims Trustee Brown could not identify anything to indicate that he cut down any trees out of malice, ill will, or hatred towards the Browns. He asserts that she believed he

negligently cut down trees without permission, though she did not know what permission he previously received, and that he did not fully pay her, when receipts show he did.

{¶87} R.C. 2315.21(C) states:

Subject to division (E) of this section, punitive or exemplary damages are not recoverable from a defendant in question in a tort action unless both of the following apply:

(1) The actions or omissions of that defendant demonstrate malice or aggravated or egregious fraud, or that defendant as principal or master knowingly authorized, participated in, or ratified actions or omissions of an agent or servant that so demonstrate.

(2) The trier of fact has returned a verdict or has made a determination pursuant to division (B)(2) or (3) of this section of the total compensatory damages recoverable by the plaintiff from that defendant.

The plaintiff has the burden to establish entitlement to punitive or exemplary damages by clear and convincing evidence.  R.C. 2315.21(D)(4).

{¶88} Malice "is (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston v. Murty*, 32 Ohio St.3d 334, 336 (1987).  Although *Preston's* use of the phrase "'rights *and* safety' in describing the latter type of malice seemed to imply a conjunctive test requiring both elements, the court clarified in the same paragraph that, to find malice under the 'conscious disregard' test, a court must conclude that 'the party consciously disregarded the injured party's rights *or* safety.'" (Emphasis in original.)  *Chapel v. Wheeler Growth Co.*, 2023-Ohio-3988, ¶ 12 (1st Dist.), quoting *Preston* at 336.  In this case, the trial court concluded Mr. Branscomb acted with conscious disregard for the rights of Trustee Brown that had a great probability of causing, and in fact caused, substantial harm.

**{¶89}** The trial court's conclusion is supported by sufficient evidence and was not against the manifest weight of the evidence. As the court explained, Mr. Branscomb began to convert the timber in 2016, when Mr. Brown was dying of brain cancer, and Mrs. Brown was caring for him. After Mr. Brown's death, Mr. Branscomb continued to convert timber. He took advantage of his relationship with Mrs. Brown to accomplish the conversion, and in the process he caused financial harm and long-term property damage. Thus, the court did not err in awarding punitive damages.

**{¶90}** On remand, the trial court's determination of the amount of compensatory damages due Trustee Brown may require revision of the amount of punitive damages. Generally, R.C. 2315.21(D)(2)(a) precludes a punitive damages award in a tort action in excess of two times the amount of compensatory damages awarded. Therefore, once the trial court determines the amount of compensatory damages due Trustee Brown, it should consider what impact, if any, that determination has on the punitive damages award, and if appropriate, adjust the amount of that award in accordance with law.

### 4. Attorney Fees

**{¶91}** Mr. Branscomb contends the trial court erred in awarding reasonable attorney fees. He presents no explicit argument in support of this contention, but we presume it is based on his challenge to the punitive damages award because "a punitive damages award opens the door to attorney's fees." *Chapel*, 2023-Ohio-3988, at ¶ 18 (1st Dist.). "At common law and throughout Ohio's history, 'recovery of reasonable attorney fees has always been permitted when punitive damages are awarded.'" *Id.*, quoting *Cruz v. English Nanny & Governess School*, 2022-Ohio-3586, ¶ 38. Because we decline to

disturb the trial court's decision to award punitive damages, we conclude the court acted within its discretion in awarding attorney fees.

**{¶92}** Mr. Branscomb also contends the trial court erred in calculating the amount of attorney fees to award relative to its punitive damages award. He asserts the attorney fee award is excessive and arbitrary because it includes work that was unrelated to the prosecution of the claims against him. Specifically, it includes work related to: (1) "the prosecution of MJT Trust and Brown's Paint Valley Farms, LLC's claims"; (2) the retrieval of his personal property; and (3) defending against his counterclaims/third-party claims, many of which he asserts settled in his favor.

**{¶93}** Mr. Branscomb invited any error in the amount of attorney fees awarded. "The doctrine of invited error specifies that a litigant may not 'take advantage of an error which he himself invited or induced.'" *State v. Garrett*, 2022-Ohio-4218, ¶ 203, quoting *Hal Artz Lincoln-Mercury, Inc. v. Ford Motor Co.*, 28 Ohio St.3d 20 (1986), paragraph one of the syllabus. For the doctrine to apply, the complaining party "must have been '"actively responsible" for the trial court's error.'" *State v. McAlpin*, 2022-Ohio-1567, ¶ 220, quoting *State v. Campbell*, 90 Ohio St.3d 320, 324 (2000), quoting *State v. Kollar*, 93 Ohio St. 89, 91 (1915). "Pursuant to this doctrine, a party cannot claim that a trial court erred by accepting the party's own stipulation." *State v. McClendon*, 2011-Ohio-6235, ¶ 37 (10th Dist.), citing *State v. J.G.,* 2009-Ohio-2857, ¶ 16 (10th Dist.).

**{¶94}** The Final Judgment Entry states that the court scheduled a hearing on Trustee Brown's award of attorney fees, and on the day of the hearing, the parties submitted an Agreed Stipulation Regarding the Amount and Reasonableness of Plaintiffs' Attorney Fees, and advised the court that further hearing was not necessary. The

stipulation states that the four original plaintiffs, collectively referred to as "Plaintiffs" in the stipulation, and Mr. Branscomb jointly agree and stipulate that in the February 12, 2024 Decision and Judgment Entry, the trial court "determined that Plaintiffs are entitled to an award of punitive damages and, as a result, that Plaintiffs are also entitled to recover their reasonable attorney fees in this case."  They agreed that "Plaintiffs' counsel . . . charged $25,206.25 in attorney fees for the legal work that he performed on behalf of Plaintiffs in this case prior to the issuance of the Court's February 12, 2024 Decision and Judgment Entry" and "charged an additional $962.50 in attorney fees for legal work performed on behalf of Plaintiffs in this case after the Court issued its February 12, 2024 Decision and Judgment Entry."  The stipulation also states:

> Plaintiffs and Defendant stipulate to the reasonableness of Plaintiffs' counsel's hourly rate, the reasonableness of the number of hours of legal work performed by Plaintiffs' counsel in this case, and the amount of attorney fees that Plaintiffs' counsel charged to Plaintiffs for legal work in this case so the Court can assign a specific amount of attorney fees to the determination made in its February 12, 2024 Decision and Judgment Entry that Plaintiffs are generally entitled to recover their attorney fees . . . .

"A copy of Plaintiffs' counsel's Statement and Invoices describing the legal work that he performed and the attorney fees that he charged in this case" was attached to the stipulation. The stipulation noted Mr. Branscomb still disagreed with the determination that "Plaintiffs are entitled to an award of punitive damages and to recover their attorney fees."

**{¶95}** The stipulation is technically inaccurate as it indicates the court determined that all four original plaintiffs were entitled to recover attorney fees even though two dismissed their claims.  Nonetheless, Mr. Branscomb joined it, did not indicate he challenged the inclusion of any specific charges in the Statement and Invoices in the

attorney fee award, and advised the court that further hearing on attorney fees was not necessary.  In accordance with the stipulation, the trial court awarded attorney fees of $26,168.78 ($25,206.25 + $962.50).  Thus, we conclude Mr. Branscomb invited any error the trial court made regarding the amount of attorney fees.

### C.  R.C. 901.51 Claim

{¶96} Mr. Branscomb contends the judgment on the R.C. 901.51 claim is not supported by sufficient evidence and was against the manifest weight of the evidence. However, he makes no argument in support of this contention.  Instead, he states that given Trustee Brown's "election to receive punitive damages and waive treble damages," the decision on the R.C. 901.51 claim "need not be further discussed." Therefore, we reject his contention.

### D.  Summary

{¶97} Because the amount of the compensatory damages award is against the manifest weight of the evidence, we sustain the second assignment of error to the extent Mr. Branscomb contends the trial court erred in awarding compensatory damages.  We overrule the second assignment of error in all other respects.

### V.  CONCLUSION

{¶98} We sustain the first assignment of error to the extent it challenges the denial of the unjust enrichment claim for improvements, but only as to the alleged $2,400 track hoe rental to straighten the creek and the alleged gravel purchases of $3,818.40.   We reverse the trial court's judgment as to, and remand for further proceedings regarding, those portions of the unjust enrichment claim for improvements.  We also sustain the second assignment of error to the extent Mr. Branscomb contends the trial court erred in

awarding compensatory damages, reverse the compensatory damages award, and remand for the trial court to determine the appropriate amount of compensatory damages due Trustee Brown and to, if appropriate, adjust the amount of punitive damages in accordance with law.  We overrule the first and second assignments of error in all other respects, and we affirm the trial court's judgment in all other respects.

JUDGMENT AFFIRMED IN PART
AND REVERSED IN PART.
CAUSE REMANDED.

## APPENDIX A

Table 1.--Diameter at breast height in relation to stump diameter at 1-foot height for Central States hardwoods

| Stump diameter (Inches) | Diameter at breast height | |
|---|---|---|
| | Yellow-poplar, black cherry, cottonwood | All other hardwoods |
| | Inches | Inches |
| 12 | 11 | 10 |
| 14 | 12 | 11 |
| 16 | 14 | 13 |
| 18 | 15 | 14 |
| 20 | 17 | 16 |
| 22 | 19 | 17 |
| 24 | 20 | 18 |
| 26 | 21 | 20 |
| 28 | 22 | 21 |
| 30 | 24 | 22 |
| 32 | 26 | 24 |
| 34 | 27 | 25 |
| 36 | 28 | 26 |

## APPENDIX B

| DIA. 4'-6" ABOVE GROUND INCHES | DOYLE LOG RULE NUMBER OF 16 FOOT LOGS IN TREE | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | ½ | 1 | 1½ | 2 | 2½ | 3 | 3½ | 4 |
| | CONTENTS IN BOARD FEET | | | | | | | |
| 12 | 20 | 30 | 40 | 50 | 60 | | | |
| 14 | 30 | 50 | 70 | 80 | 90 | 100 | | |
| 16 | 40 | 70 | 100 | 120 | 140 | 160 | 180 | 190 |
| 18 | 60 | 100 | 130 | 160 | 200 | 220 | 240 | 260 |
| 20 | 80 | 130 | 180 | 220 | 260 | 300 | 320 | 360 |
| 22 | 100 | 170 | 230 | 280 | 340 | 380 | 420 | 460 |
| 24 | 130 | 220 | 290 | 360 | 430 | 490 | 540 | 600 |
| 26 | 160 | 260 | 360 | 440 | 520 | 590 | 660 | 740 |
| 28 | 190 | 320 | 430 | 520 | 620 | 710 | 800 | 880 |
| 30 | 230 | 380 | 510 | 630 | 740 | 840 | 940 | 1040 |
| 32 | 270 | 440 | 590 | 730 | 860 | 990 | 1120 | 1220 |
| 34 | 300 | 510 | 680 | 850 | 1000 | 1140 | 1300 | 1440 |
| 36 | 350 | 580 | 780 | 970 | 1140 | 1310 | 1480 | 1640 |
| 38 | 390 | 660 | 880 | 1100 | 1290 | 1480 | 1680 | 1860 |
| 40 | 430 | 740 | 990 | 1230 | 1450 | 1660 | 1880 | 2080 |
| 42 | 470 | 830 | 1100 | 1370 | 1620 | 1860 | 2100 | 2320 |

## APPENDIX C

## Walnut Trees

| Unit where tree located | Tree ID# assigned by Murray | Stump diameter in inches measured by Murray | Adjusted stump diameter (stump diameter measured by Murray minus two Inches) | DBH based on adjusted stump diameter[5] | Log length per Murray | Board foot volume determined using DBH based on adjusted stump diameter[6] | Board foot volume originally calculated by Murray |
|---|---|---|---|---|---|---|---|
| 1 | 1 | 22 | 20 | 16 | 1.5 | 100 | 180 |
| 1 | 2 | 24 | 22 | 17 | 2 | 140 | 280 |
| 1 | 3 | 23 | 21 | 16.5 | 2 | 130 | 220 |
| 1 | 4 | 25 | 23 | 17.5 | 2 | 150 | 280 |
| 1 | 5 | 24 | 22 | 17 | 1.5 | 115 | 230 |
| 1 | 6 | 20 | 18 | 14 | 1.5 | 70 | 130 |
| 1 | 7 | 18 | 16 | 13 | 1.5 | 55 | 100 |
| 1 | 8 | 24 | 22 | 17 | 2.5 | 170 | 340 |
| 1 | 9 | 22 | 20 | 16 | 2 | 120 | 220 |
| 1 | 10 | 20 | 18 | 14 | 2 | 80 | 160 |
| 1 | 11 | 21 | 19 | 15 | 2 | 100 | 160 |
| 1 | 12 | 22 | 20 | 16 | 2.5 | 140 | 260 |
| 1 | 13 | 21 | 19 | 15 | 1 | 60 | 100 |
| 1 | 14 | 18 | 16 | 13 | 1 | 40 | 70 |
| 1 | 15 | 19 | 17 | 13.5 | 1.5 | 62.5 | 100 |
| 1 | 17 | 24 | 22 | 17 | 2.5 | 170 | 340 |
| 1 | 18 | 22 | 20 | 16 | 1.5 | 100 | 180 |
| 1 | 35 | 31 | 29 | 21.5 | 3 | 360 | 710 |
| 1 | 39 | 22 | 20 | 16 | 1.5 | 100 | 180 |
| 1 | 41 | 20 | 18 | 14 | 2 | 80 | 160 |
| 1 | 42 | 22 | 20 | 16 | 2 | 120 | 220 |

[5] Quigley's table only shows DBH for even-numbered stump diameters. It is not clear from the record how DBH is determined for odd-numbered stump diameters. For purposes of this decision, in determining DBH for each odd-numbered stump diameter, we looked at DBH for the even-numbered stump diameters immediately before and after the odd-numbered stump diameter. We presumed the change in DBH was uniform and constant. So if the walnut stump diameter was 21, its DBH would be 16.5 because the DBH for a 20-inch diameter walnut stump is 16, and the DBH for a 22-inch diameter walnut stump is 17.

[6] The Doyle Log Rule only lists even-numbered DBHs. It appears from Murray's calculations that when faced with an odd-numbered DBH, he used board foot volume for the next highest even-numbered DBH. It is unclear why he did so. For purposes of this decision, in determining board foot volume when DBH was an odd number or a mixed number, we determined board foot volume using the even-numbered DBH immediately before and after the odd number or mixed number DBH. We presumed the change in board foot volume was uniform and constant. So if DBH was 16.5 and there were two, 16 foot logs in the tree, board foot volume would be 130, because at a DBH of 16, it would be 120, and at a DBH of 18, it would be 160.

| | | | | | | |
|---|---|---|---|---|---|---|
| 1 | 44 | 20 | 18 | 14 | 1.5 | 70 | 130 |
| 1 | 45 | 28 | 26 | 20 | 1.5 | 180 | 290 |
| 1 | 46 | 22 | 20 | 16 | 2 | 120 | 200 |
| 1 | 47 | 23 | 21 | 16.5 | 1.5 | 107.5 | 180 |
| 1 | 48 | 28 | 26 | 20 | 1.5 | 180 | 290 |
| 1 | 49 | 19 | 17 | 13.5 | 2 | 72.5 | 120 |
| 2 | 1 | 28 | 26 | 20 | 1.5 | 180 | 430 |
| 2 | 2 | 21 | 19 | 15 | 2 | 100 | 160 |
| 2 | 5 | 24 | 22 | 17 | 2 | 140 | 240 |
| 2 | 8 | 26 | 24 | 18 | 2 | 160 | 340 |
| 2 | 9 | 24 | 22 | 17 | 2 | 140 | 240 |
| 2 | 10 | 30 | 28 | 21 | 3 | 340 | 590 |
| 2 | 13 | 21 | 19 | 15 | 1.5 | 85 | 130 |
| 2 | 14 | 36 | 34 | 25 | 2.5 | 475 | 680 |
| 2 | 15 | 20 | 18 | 14 | 1.5 | 70 | 115 |
| 2 | 18 | 24 | 22 | 17 | 2 | 140 | 240 |
| 2 | 20 | 24 | 22 | 17 | 2 | 140 | 240 |
| 2 | 21 | 28 | 26 | 20 | 2.5 | 260 | 430 |
| 2 | 22 | 33 | 31 | 23 | 2.5 | 385 | 620 |
| 2 | 24 | 24 | 22 | 17 | 2 | 140 | 240 |
| 2 | 25 | 21 | 19 | 15 | 1.5 | 85 | 130 |
| 2 | 27 | 30 | 28 | 21 | 2.5 | 300 | 520 |
| 2 | 29 | 28 | 26 | 20 | 3 | 300 | 490 |
| 2 | 34 | 23 | 21 | 16.5 | 1 | 77.5 | 130 |
| 2 | 36 | 28 | 26 | 20 | 2 | 220 | 360 |
| 2 | 42 | 20 | 18 | 14 | 1.5 | 70 | 115 |
| 3 | 41 | 25 | 23 | 17.5 | 2.5 | 185 | 300 |
| 3 | 42 | 34 | 32 | 24 | 3 | 490 | 775 |
| 3 | 43 | 29 | 27 | 20.5 | 2 | 235 | 400 |
| 3 | 3 | 25 | 23 | 17.5 | 2 | 150 | 250 |
| 3 | 5 | 24 | 22 | 17 | 2.5 | 170 | 300 |
| 3 | 6 | 20 | 18 | 14 | 2 | 80 | 140 |
| 3 | 8 | 24 | 22 | 17 | 1.5 | 115 | 300 |
| 3 | 9 | 23 | 21 | 16.5 | 3 | 175 | 300 |
| 3 | 13 | 18 | 16 | 13 | 1 | 40 | 70 |
| 3 | 14 | 23 | 21 | 16.5 | 2.5 | 155 | 260 |
| 3 | 16 | 23 | 21 | 16.5 | 2 | 130 | 220 |
| 3 | 18 | 26 | 24 | 18 | 2 | 160 | 280 |
| 3 | 30 | 23 | 21 | 16.5 | 2.5 | 155 | 260 |
| 3 | 31 | 26 | 24 | 18 | 2.5 | 200 | 340 |
| 3 | 36 | 28 | 26 | 20 | 2 | 220 | 360 |
| 3 | 37 | 22 | 20 | 16 | 1.5 | 100 | 155 |
| | | | | | | **Total: 9,760** | **Total: 16,980** |

## JUDGMENT ENTRY

It is ordered that the JUDGMENT IS AFFIRMED IN PART AND REVERSED IN PART and that THE CAUSE IS REMANDED.  Appellant and appellee shall split the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the ROSS COUNTY COURT OF COMMON PLEAS to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this entry

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Wilkin, J.: Concur in Judgment and Opinion.


For the Court


BY: _____
        Michael D. Hess, Judge



**NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 22, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**